U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

FEB - 3 2017
1:11 pm

CLERK, U.S. DISTRICT COURT
By_____
              Deputy

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **JOANN BROWN,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **NO. 4:16-CV-884-A** |
| | § | |
| **COLONIAL SAVINGS F.A.,** | § | |
| | § | **Hon. Judge McBryde** |
| | § | |
| *Defendant.* | § | |

---

## PLAINTIFF JOANN BROWN'S FIRST AMENDED COMPLAINT AND JURY DEMAND WITH DISCOVERY ATTACHED

---

### INTRODUCTION

Joann Brown (hereinafter "Annie," "Ms. Brown," or "Plaintiff"), brings this Complaint against Defendant Colonial Savings F.A. ("Colonial" or "Defendant") to recover for the Defendant's unlawful retaliation of Brown for providing information concerning certain violations of the Securities Act of 1933, as amended, Securities Exchange Act of 1934, as amended, Sarbanes-Oxley Act of 2002, as amended, the Electronic Funds Transfer Act, as amended, the Dodd-Frank Act, and other provisions of Federal consumer protection law.

Colonial serviced mortgages for publicly-traded companies such as, or similar to, Fannie Mae (FNMA), Wells Fargo (WFC), Bank of America (BAC), Chase (CCF), and various other banks. The bank that originates the mortgage loan, meaning, processes the loan application and collects an origination fee is called the loan originator. The bank, or other entity, that services that mortgage loan after the mortgage loan is funded is called the loan servicer. Banks often originate loans and then sell the loans to investor banks. Those investor banks often "securitize" the loans

and sell the securitized loans as mortgage-backed securities. Together, these entities form an integrated enterprise within which are a set of interconnected, agency, and contractor relationships, and other affiliations.

## I.   JURISDICTION AND VENUE

1.   Jurisdiction over Brown's federal claim is proper in the Northern District of Texas under 28 U.S.C. § 1331, 8 U.S.C. § 514A(b)()(B), 29 C.F.R. § 1980, 12 U.S.C. § 5567, and 15 U.S.C. 1693, *et seq* because Brown filed a complaint with the Secretary of Labor under 8 U.S.C. § 1541(b)(1)(A), and the Secretary of Labor has not issued a final decision within 180 days of the filing of the complaint and there is no showing that such delay is due to any bad faith on Brown's part.

2.   Venue is appropriate in the Northern District of Texas under 28 U.S.C. § 1391 because Colonial's principle office is in the Northern District of Texas, and the events that gave rise to this suit accrued in the Northern District of Texas.

## II.   PARTIES

3.   Plaintiff Joann Brown, at all relevant times, was and is an American citizen of the United States and resident of the Northern District of Texas, and is over the age of eighteen (18) years. Ms. Brown was Colonial's "employee" within the meaning of 18 U.S.C. § 1514A and all statutes relevant to this litigation. Ms. Brown may be served through her attorneys of record, Joshua Graham & Associates, PLLC at 100 E 15th Street, Suite 635, Fort Worth, Texas 76102.

4.   Defendant Colonial Savings F.A. ("Colonial" or "Defendant") is a company within the meaning of 18 U.S.C. §1514A in that it is a company that contracts with corporations with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 781)

and provides material information to publicly traded corporations which are required to file reports under Section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(d)).  Defendant Colonial Savings F.A. may be served at 2600 West Freeway, Fort Worth, Texas 76102.

## III.  DISCOVERY ATTACHED

5.  Plaintiff attaches hereto as Exhibit 1, and incorporates by reference for all purposes, an anti-spoliation letter to Defendant Colonial Savings F.A.

6.  Discovery requests to Defendants are attached to this Original Complaint. Pursuant to Rule 34(b)(2)(A) of the Federal Rules of Civil Procedure, Plaintiff requests that Defendant produce written responses to the following discovery requests within thirty (30) days of the Parties' first Rule 26(f) conference:  Exhibit 2, Plaintiff's First Request for Production.

## IV.    FACTS

### THE MORTGAGE SERVICING PROCESS

7.  The bank that originates the mortgage loan, meaning, processes the loan application and collects an origination fee is called the loan originator.

8.  The bank, or other entity, that services the mortgage loan after the mortgage loan is funded is called the loan servicer.  Banks often originate loans and then sell the loans to investor banks. Those investor banks often "securitize" the loans and sell the securitized loans as mortgage-backed securities.

Mortgage servicing is generally initiated in the following ways:

a. Bank originates a mortgage loan and then keeps the loan as part of its portfolio. Banks usually only do this when the borrower is a "prime" (extremely low risk) borrower and the bank is funding the loan from the bank's own deposits.

b. Bank originates a mortgage loan and sells the mortgage loan to a third-party investor such as Fannie Mae or another bank. Often times a bank will keep the right to service the loan on behalf of the investor for a fee. Banks that keep the servicing rights then either service the mortgage loan in its own name or subcontracts the servicing out to another servicer such as Colonial.

c. Bank purchases the servicing rights from another servicer and either services the loan in its own name or subcontracts out the loan to another servicer such as Colonial.

d. Bank purchases a pool of mortgage loans from another investor and then works with the pre-existing servicers that own the rights to service the mortgages.

9. The role of the bank that owns the mortgage loans is to provide oversight to the mortgage servicer that services the loans. Any time that a bank subcontracts to a third-party servicer the responsibility to service the mortgage loans on its behalf, the third-party servicer steps into the bank's shoes. For example, if Wells Fargo subcontracts to Colonial to service the mortgage loans that Wells Fargo owns the servicing rights to, Colonial steps into Wells Fargo's shoes, operating under the same duties and responsibilities. In this example, Wells Fargo is a publicly-traded company. Each third-party servicer that services Wells Fargo's mortgage loans has the same duties and responsibilities as Wells Fargo does to its shareholders. Therefore, servicers must maintain systems, such as Fiserv, to accurately track mortgages and the associated financial reporting.

10. Typically, a third-party servicer reports to the entity that it contracted with the performance of the entire portfolio of mortgage loans that the third-party services for that particular entity. In the previous example, Colonial would report to Wells Fargo the performance of all the mortgage loans that Colonial services on behalf of Wells Fargo. Wells Fargo would in turn use that reporting to prepare its forecasts and shareholder disclosures.

11. Historically, many of the challenges to the enforceability of mortgage loan documents in the foreclosure process have been based on the failure of the mortgage originator or mortgage servicer to properly adhere to banking best practices such as proper form, proper substance, and proper notices to borrowers.

12. Under the Sarbanes-Oxley Act of 2002 ("SOX" or the "Act"), the Securities and Exchange Commission ("SEC") was directed to adopt rules to require the principal executive and financial officers of a publicly-traded company to certify in the publicly-traded company's annual and quarterly reports that such reports are accurate and complete. The certification goes further to attest that the officers have established and maintained adequate internal controls for public disclosure. Phrased a different way, the officers must attest that there are sufficient processes in place to ensure that any information that should be disclosed to shareholders is communicated upwards in the company and then outward to the public. The law's effect is that the officers' personal certification guarantees that the annual and quarterly reports are complete and accurate thus minimizing the potential for fraud on the shareholder.

13. Under SOX, all companies are forbidden from retaliating against employees who, based on a good-faith belief, report mail fraud, wire fraud, and bank fraud.

14. When a servicer like Colonial steps into the shoes of a bank such as, or similar to, Fannie Mae (FNMA), Wells Fargo (WFC), Bank of America (BAC), Chase (CCF), and various other banks, its ability to properly report up to the publicly-traded Wells Fargos of the world affects the

publicly-traded company's ability to accurately report outward to the public. Colonial inherits the duties and responsibilities to accurately report from its publicly-traded customers in the same way that the privately-held Fidelity inherited its duties and responsibilities from its publicly-traded mutual funds in *Lawson v. FMR*, 134 S.Ct. 1158, 1158 (2014).

## COLONIAL SAVINGS, F.A. AS A MORTGAGE SERVICING CONTRACTOR TO PUBLICLY-TRADED BANKS

15. Colonial Savings F.A. is a bank with approximate assets totaling more than $1,300,000,000.

16. Colonial serviced mortgages for publicly-traded companies such as, or similar to, Fannie Mae, Wells Fargo, Bank of America, Chase, and various other banks.

17. Together, these entities form an integrated enterprise within which are a set of interconnected, agency, and contractor relationships, and other affiliations.

18. All day-to-day operational, reporting, and fiduciary decisions made on the behalf of the investor bank are ordinarily made by the servicer, in this case, Colonial.

19. Based on information and belief, during the times relevant to this suit, Colonial serviced mortgage loans both as a sub-servicer for other banks and on its own behalf, where Colonial retained the servicing rights.

20. As a contracted servicer for other banks, Colonial was subject to the same regulations as the publicly-traded banks for which Colonial serviced mortgages because Colonial essentially stepped into the shoes of the publicly-traded bank.

21. Some of the banks for which Colonial was the contracted servicer for were publicly-traded companies, subject to the Securities Act of 1933, Securities Exchange Act, Sarbanes Oxley, Dodd-

Frank, the Consumer Finance Protection Act, and the Electronic Funds Transfer Act, as respectively amended.

22. Colonial provided a "consumer financial product or service" as defined by the Consumer Finance Protection Act, 12.U.S.C. § 5481 because it collected financial payments from the consumer and applied the payments to a mortgage—often a mortgage owned or serviced on behalf of a publicly-traded company.

23. One of the consumer services that Colonial offered was the ability for mortgage borrowers to elect to have mortgage payments withdrawn from the consumer's checking account via automatic clearing house (ACH) and then applied to the borrower's mortgage—often a mortgage owned or serviced on behalf of a publicly-traded company.

## JOANN BROWN'S EMPLOYMENT

24. Joann Brown was Colonial's "employee" within the meaning of 18 U.S.C. § 1514A.

25. On January 14, 2013, Colonial hired Joann Brown as Assistant Vice President of Business Support.  A copy of the job description for which she was hired is attached hereto and incorporated herein as Exhibit 3.

26. At the time that Colonial hired Ms. Brown, she reported to Tim Neer.

27. At the time that Ms. Brown's employment was terminated, she reported to Tim Neer's subordinate, John Roden.

28. As Assistant Vice President over Colonial's Business Support Department, Joann Brown was responsible for overseeing the teams that implemented change throughout the organization, including changes to the systems that generated letters to customers that Colonial serviced on behalf of publicly-traded banks.

29. Often the projects that Ms. Brown oversaw affected risk, legal, and compliance areas to which her organization provided critical services. An example of Ms. Brown's job responsibilities in action is attached hereto and incorporated herein by reference as Exhibit 4.

30. Ms. Brown's Business Support Department was responsible for Project Management, Business Analysis, Vendor Management, Policy and Procedures, as well as Fiserv System Administration including developing vision, strategy, structure and program management.

31. Fiserv is the mortgage servicing system that Colonial adopted to service its mortgage loans, including those loans that it serviced for publicly-traded companies.

32. Ms. Brown led Colonial's Business Support Department to earn the first STAR Performance Rating for the 2014 Fannie Mae STAR Organizational Overview and Shared Processes Assessment, with no further recommendations or action items required.

33. The Federal National Mortgage Association, known colloquially as Fannie Mae, is a publicly-traded company, traded under the stock symbol FNMA.

34. Ms. Brown's Business Support Department was also a major contributor to Colonial being recognized as a STAR Performer for best practices in the areas of General Servicing, Collections/Loss Mitigation and Neighborhood Stabilization for 2014.

35. Colonial was the only servicer in its peer group to be recognized as a STAR Performer in all three assessment categories, making it Fannie Mae's highest achieving STAR Performer within the group.

36. Ms. Brown's Business Support Department worked with the Lines of Business and Information Technology Department to comply with all major Consumer Finance Protection Bureau ("CFPB") guidelines that required systemic changes.

37. Ms. Brown's Business Support Department was responsible for managing all projects that required systemic changes, and technology workarounds, to comply with all regulatory bodies,

including: CFPB, the Office of Comptroller of Currency, Housing and Urban Development, Fannie Mae, Freddie Mac, Ginnie Mae, and MERS.

38. The Federal Home Loan Servicing Corporation, known colloquially as Freddie Mac, is a publicly-traded company, traded under stock symbol FMCC.

39. Ms. Brown had access to Colonial's financial systems because her Department was responsible for documenting system parameters, creating and facilitating the change management process, making the actual system changes, and then communicating those changes to the broader organization.

40. Ms. Brown was often the bearer of bad news because Colonial employees were so afraid to take compliance and deficient process issues to Tim Neer, that they would take those issues to Ms. Brown—Tim Neer's subordinate.

41. Ms. Brown was in a position to effect change because her Business Support Department was the crossroads where nearly all of Colonial's business processes intersected.

42. Ms. Brown was responsible for compliance and ensuring that Colonial's business units had the right letters in place.


## COLONIAL'S FRAUDULENT LETTER

43. During a February 9, 2015 staff meeting, Ms. Brown learned that notice letters informing mortgage borrowers of material changes to ACH withdrawals were not timely mailed to mortgage borrowers resulting in overdrafts to consumer bank accounts.

44. Many, if not all, of these mortgage borrowers were borrowers whose loans Colonial serviced on behalf of publicly-traded banks.

45. Despite the automatic draft changes taking effect on February 1, 2015, Colonial failed to notify consumers until February 4, 2015.

46. Colonial dated the consumer letters January 8, 2015.

47. Colonial mailed, via U.S. Mail, the back-dated consumer letters as a means to falsely document that it notified consumers before the February 1, 2015 implementation date.

48. Colonial's management was aware of the ACH notice issue.

49. Colonial's change to the ACH withdrawals caused some mortgage borrowers to incur overdraft fees and negative balances on consumer checking accounts.

50. Colonial's management reported that only about ten thousand consumers were affected.

51. Colonial's willingness to send a backdated letter to mortgage borrowers is indicative of a potentially larger problem affecting its publicly-traded and federally-regulated customers, which Ms. Brown was very concerned about.

## JOANN BROWN'S GOOD FAITH BELIEF

52. Ms. Brown believed that, on its face, Colonial's letters were fraud.

53. Ms. Brown believed that Colonial stamping the envelopes containing the letters and sending them through the U.S. mail was mail fraud.

54. Ms. Brown believed that by withdrawing funds from the mortgage borrower's consumer checking account without the mortgage borrower's effective consent, using computers or wires, Colonial was committing a form of wire fraud.

55. Ms. Brown believed that by withdrawing funds from consumer accounts without the mortgage borrower's effective consent, Colonial was committing a form of bank fraud.

56. Ms. Brown believed that Colonial's letter violated the Dodd-Frank Act because Colonial was subject to Dodd-Frank, the Consumer Finance Protection Act, and other federal laws that were applicable to Colonial as a contracted servicer for investor banks, some of which were publicly-traded companies.

57. Ms. Brown researched the Electronic Funds Transfer Act ("EFTA") and, based on her layman's interpretation, determined that the EFTA required banks to notify consumers whenever the ACH date or the amount changes.

58. In some cases, either the date, the amount, or both the date and amount of the ACH withdrawal that Colonial took from the mortgage borrower's bank account had changed.

59. Ms. Brown had a good faith belief that Colonial was violating the EFTA.

## JOANN BROWN'S PROTECTED ACTIVITY CONCERNING VIOLATIONS

60. Based on her good faith belief, Ms. Brown researched the scale of the issue and determined that Colonial's failure actually affected 40,000 customers, which she believed to be a material inaccuracy and omission.

61. Ms. Brown alerted her supervisor, John Roden, that Colonial may be violating one of the consumer finance laws, and that the downstream effect to investor banks could result in other regulatory violations. For example, a securities violation or consumer protection violation under Dodd-Frank.

62. On February 16, 2015, Colonial held a staff meeting, in which the consumer notices were addressed again.

63. Colonial's management dismissed Ms. Brown's concerns regarding the consumer notices, stating that it was simply a "weird timing issue" and only a few calls came in from mortgage borrowers regarding the letters.

64. After Colonial's management dismissed her concerns regarding the consumer notices, Ms. Brown again reported her research to her supervisor.

65. After Colonial's management dismissed her concerns regarding the consumer notices, Ms. Brown reported her research to Colonial's attorney.

66. After Colonial's management dismissed her concerns regarding the consumer notices, Ms. Brown reported her research to the Human Resources Department.

67. Ms. Brown reiterated that she believed Colonial Savings may have violated federal law by backdating the letters. She reiterated that the issue should be thoroughly researched and remediated because it affected 40,000 customers.

68. In Colonial's March 11, 2016 letter to the Department of Labor, Exhibit 6, Colonial acknowledged in Footnote 7 that Ms. Brown made at least two comments to Colonial's Human Resources Department concerning the consumer letters.

69. The Human Resources Department then directed Ms. Brown back to John Roden, the supervisor that Ms. Brown first reported the issue to.

## COLONIAL'S RETALIATION AGAINST BROWN

70. Tim Neer and John Roden began mistreating Ms. Brown after she complained about what she perceived to be a fraudulent letter.

71. During regular meetings with Tim Neer, Mr. Neer verbally abused Ms. Brown; he berated Ms. Brown and told her she was a failure.

72. Despite being designated as an attendee to a leadership training event, Colonial excluded Ms. Brown as punishment for persisting to sound the alarm regarding Colonial's practices.

73. Ms. Brown complained to Colonial about how Tim Neer mistreated her. Colonial did not intervene.

74. On multiple occasions, Ms. Brown complained to Human Resources about Tim Neer's behavior and actually labeled it retaliation for her complaints.

75. Despite John Roden being Ms. Brown's immediate supervisor, Tim Neer, John Roden's superior, singled Ms. Brown out and drafted her performance review.

76. Tim Neer's performance review of Ms. Brown was critical of Ms. Brown's performance despite evidence to the contrary that Ms. Brown satisfactorily performed her job.

77. Tim Neer withheld this critical performance review from Ms. Brown for several months.

78. Tim Neer would later backdate the performance review as a means to falsify evidence to support Colonial's legal defense.

79. Tim Neer ostracized Ms. Brown and at times would act as if she did not exist.

80. Ms. Brown was presented with the negative performance review in March 26, 2015 despite the performance review purporting to be drafted *Sunday,* January 8, 2015.

81. Unlike prior years, Ms. Brown was not afforded the opportunity to counter-sign or rebut the negative performance review.

82. Contemporaneous with her annual performance review, Tim Neer presented Ms. Brown with a performance improvement plan on March 26, 2015.

83. The design of this improvement plan was such that it was vague and impossible for Ms. Brown to complete the plan satisfactorily.


## COLONIAL'S TERMINATION OF BROWN

84. On July 1, 2015, Tim Neer and John Roden met with Ms. Brown intending to terminate her employment.

85. Prepared to terminate Ms. Brown's employment, Tim Neer and John Roden had a severance package prepared and presented it to Ms. Brown.

86. Having foresight that termination was likely the meeting's purpose, Ms. Brown tendered her resignation in lieu of termination.

87. Ms. Brown timely filed a Complaint with the Department of Labor.

## BROWN'S PURSUIT OF ADMINISTRATIVE REMEDIES

88. Plaintiff Joann Brown timely filed a complaint with the Secretary of Labor on or about December 23, 2015, alleging that Colonial took adverse action against her in retaliation for her complaints that Colonial failed to give proper notice to customers that the date and amounts of ACH withdrawals were going to change. Ms. Brown also complained that, for reporting purposes, Colonial only reported that 10,000 customers were impacted rather than the much larger true impact to 40,000 customers.

89. The Department of Labor's Office of the Whistleblower Protection Program formally acknowledged Ms. Brown's complaint on February 22, 2016 in a letter attached hereto and incorporated by reference herein as Exhibit 5.

90. Colonial responded to Ms. Brown's Complaint on March 11, 2016. Ms. Brown attaches hereto and incorporates by reference herein Colonial's Response as Exhibit 6.[1]

91. Ms. Brown replied to Colonial's Response to the Department of Labor on June 24, 2016. Ms. Brown attaches hereto and incorporates by reference herein Joann Brown's Reply to Colonial's Response as Exhibit 7.

92. On August 23, 2016, the Department of Labor granted Ms. Brown's request to bring a *de novo* action in Federal District Court under 18 U.S.C. § 1514A(b)(1)(B) because the Secretary had not issued a final decision within 210 days of the complaint's filing. The letter from the Department of Labor is attached hereto and incorporated by reference herein as Exhibit 8.

93. Ms. Brown timely brings this suit after final disposition of her claim from the Department of Labor.

---

[1] Colonial's exhibits that it attached to its original Response to the DOL contained Ms. Brown's social security number and other private information without any regard to Ms. Brown's privacy, in contravention to the DOL's instructions outlined in Exhibit 5. Ms. Brown redacts this information in Exhibit 6.

## CAUSES OF ACTION

### V.   JOANN BROWN'S FIRST CAUSE OF ACTION: RETALIATION IN VIOLATION OF 12 U.S.C. § 5567 BY COLONIAL F.A.

94. Joann Brown realleges and incorporates herein the allegations contained in each and every preceding paragraph as if fully stated herein.

95. Colonial provided a "consumer financial product or service" as defined by the Consumer Finance Protection Act of 2010, 12.U.S.C. § 5481.

96. Colonial is a financial institution subject to the Electronic Funds Transfer Act.

97. As an employee who performed tasks related to the offering or provision of a consumer financial product or service, Ms. Brown was a covered employee under 12 U.S.C. § 5567.

98. One of the consumer services that Colonial offered was the ability for borrowers to elect to have mortgage payments withdrawn from the consumer's checking account via automatic clearing house (ACH).

99. Ms. Brown engaged in protected activity under Dodd-Frank when she provided information to her employer about activity that she reasonably believed violated the Consumer Protection Act of 2010, the Electronic Funds Transfer Act, and Dodd-Frank, and objected to the activity.

100.     Ms. Brown engaged in protected activity under Dodd-Frank when she reported that consumer notices were untimely mailed to 40,000 mortgage borrowers.

101.     Ms. Brown engaged in protected activity under Dodd-Frank when she reported and complained of the material difference between the 10,000 mortgage borrowers that Colonial's management reported and what she believed was actually 40,000 affected mortgage borrowers.

102.     Ms. Brown engaged in protected activity under Dodd-Frank when she reported that the consumer notices were dated nearly a month before the notices were actually mailed to consumers and objected to this practice.

103.     On its face, a back-dated letter that purports to give advanced notice of a pending transaction, mailed after the effective date of a purportedly pending transaction is fraudulent *ab initio*, and would raise a red flag with any reasonable person.

104.     Ms. Brown had a reasonable belief that Colonial back-dated consumer notices and Ms. Brown was very vocal about her belief, including complaining to her supervisor, to Colonial's Human Resources Department, and to Colonial's General Counsel.

105.     Colonial's management knew about Ms. Brown's efforts to investigate and define the effect on consumers.

106.     Ms. Brown went beyond her normal job process, and following company policy, escalated allegations of potential fraud to Colonial's management.

107.     When Ms. Brown discovered what appeared to be fraud was occurring on a widespread basis she went the extra step and tried to take action to prevent its future occurrence.

108.     Ms. Brown's protected activity was a contributing factor in the adverse action taken against her.

109.     Colonial's day-to-day mistreatment of Ms. Brown was verbally and emotionally abusive.

110.     The decision to terminate Ms. Brown was motivated, at least in part, to retaliate and silence her complaints of a management cover-up of fraudulent activities, to hide the appearance of unethical and fraudulent banking practices, as well as to intimidate other employees who might be considering blowing the whistle.

111.     The temporal proximity between Ms. Brown's reporting to Colonial potential fraud and violations of Dodd-Frank, the Electronic Funds Transfer Act, and the Consumer Finance Protection Act, directly resulted in Ms. Brown's termination, creating a strong inference of retaliation.

112.     Colonial retaliated against Ms. Brown through the issuance of a poor employee performance review.  Consequently, Ms. Brown received below standard scores, was excluded from training opportunities, and was put on an improvement plan beginning March 26, 2015 that contained vague and unattainable goals.

113.     Ultimately, Colonial either actually or constructively terminated Ms. Brown's employment.

## VI.     JOANN BROWN'S SECOND CAUSE OF ACTION: RETALIATION IN VIOLATION OF 18 U.S.C. § 1514A AND 12 U.S.C. § 5567 BY COLONIAL F.A.

114.     Joann Brown realleges and incorporates herein the allegations contained in each and every preceding paragraph as if fully stated herein.

115.     Ms. Brown was at all relevant times an employee covered by the whistle-blower protections of SOX and Dodd-Frank, as codified at 18 U.S.C. § 1514A and 12 U.S.C. § 5567, respectively.

116.     Colonial was at all relevant times contractors, subcontractors, or agents within the meaning of 18 U.S.C. § 1514A, of publicly-traded companies, or were integrated entities of publicly-traded companies.

117.     Ms. Brown was an employee of a contractor of a publicly-traded company.

118.     As an employee of a contractor of a publicly-traded company, Ms. Brown was a protected, or otherwise covered, employee under 18 U.S.C. § 1514A and 12 U.S.C. § 5567, as further articulated in *Lawson v. FMR LLC*, 134 S. Ct. 1158 (2014).

119.     Ms. Brown engaged in protected activity under Sarbanes Oxley and Dodd-Frank when she investigated the possibility that Colonial committed regulatory violations.

120.     Ms. Brown engaged in protected activity under Sarbanes Oxley and Dodd-Frank when she provided information, caused information to be provided, and otherwise investigated potential mail fraud, wire fraud, or bank fraud.

121.     Ms. Brown engaged in protected activity under Sarbanes Oxley and Dodd-Frank when she provided information to Colonial about activity that she reasonably believed violated banking laws, including the Dodd-Frank and Consumer Protection Act of 2010, and objected to the activity.

122.     Ms. Brown engaged in protected activity under Sarbanes Oxley and Dodd-Frank when she reported that consumer notices were not timely mailed to 30,000 customers more than reported by Colonial's management.

123.     Ms. Brown engaged in protected activity under Sarbanes Oxley and Dodd-Frank when she reported that she believed that the consumer notices were dated nearly a month before the notices were actually mailed to consumers via U.S. Mail.

124.     Ms. Brown engaged in protected activity under Sarbanes Oxley and Dodd-Frank when she objected to what she perceived was a practice of back-dating consumer notices.

125.     On its face, a back-dated letter that purports to give advanced notice of a pending transaction, mailed after the effective date of the purportedly pending transaction is fraudulent *ab initio*, and would raise a red flag with any reasonable person.

126.     Ms. Brown had a reasonable belief that Colonial back-dated consumer notices and Ms. Brown was very vocal about her belief, including complaining to Colonial's Human Resources Department and to Colonial's General Counsel.

127.     Colonial's management knew about Ms. Brown's efforts to investigate and define the effect on consumers.

128.     Ms. Brown went beyond her normal job process, and following company policy, escalated allegations of fraud to Colonial's management.

129.     When Ms. Brown discovered that what she perceived as fraud was occurring on a massive basis, she went the extra step and tried to take action to prevent its future occurrence.

130.     Ms. Brown's protected activity was a contributing factor in Colonial's adverse action taken against her. Colonial's decision to terminate Ms. Brown was motivated, at least in part, for the purpose to retaliate and silence her complaints of management cover-up of fraudulent activities and to expose unethical and fraudulent banking practices, as well as to intimidate other employees who might be considering blowing the whistle.

131.     The temporal proximity between Ms. Brown's reporting of fraud and violations of the Consumer Finance Protection Act, directly resulted in Ms. Brown's termination, creating a strong inference of retaliation.

132.     The systemic underreporting of fraud and consumer protections is a material misrepresentation which Colonial omitted to disclose to its publicly traded corporate customers for which Colonial serviced mortgages.

133.     Numerous purchases and sales of securities occurred during the period of Ms. Brown's continuing complaint. Reliance would be assumed if fraud is proved, but it is reasonable for an investor to rely upon the financial statements provided by Colonial's publicly traded corporate customers to their respective investors under Sarbanes Oxley and Dodd-Frank.

134.     As to servicing mortgages for investors, banks, and government entities, the systemic underreporting of fraud and consumer protection violations constituted a fraud on each of these classes. This type of fraud entailed the use of the mail and wires, and involved banking institutions, bringing this matter well within Sarbanes Oxley and Dodd-Frank.

135.     These publicly traded corporate customers relied upon Colonial's financial reports and analyses of the subject mortgages that were based on the systemic fraud and consumer protection violations about which Ms. Brown complains, and which thereby materially overstated the value of said investments.

136.     Based on information and belief, the publicly traded banks for which Colonial serviced mortgages for did not report Colonial's deficiencies to their respective shareholders because Colonial allegedly failed to communicate its failures upward to those banks.

137.     By keeping the reports of fraud and consumer protection violations covered up rather than disclosing the fraud to publicly traded corporate customers and regulators, Colonial engaged in a deliberate policy to systematically overstate its mortgage servicing financial results and consumer protection compliance to the publicly traded corporation that Colonial serviced mortgages for.

138.     Colonial retaliated against Ms. Brown through the issuance of a poor employee performance review.  Consequently, Ms. Brown received below standard scores, was excluded from training opportunities, and was put on an improvement plan beginning March 26, 2015 that contained vague and unattainable goals.

## VII.    DAMAGES

139.     Joann Brown realleges and incorporates herein the allegations contained in each and every preceding paragraph as if fully stated herein.

140.     Due to Colonial's actions, including but not limited to Ms. Brown's ultimate actual or constructive termination, Joann Brown suffered, and continues to suffer, damages including but not limited to lost wages, both past and future, the value of fringe benefits, emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life.

141.     Colonial's actions reference in each and every preceding paragraph caused Joann Brown to retain the legal services of Joshua Graham & Associates, PLLC in order to pursue her federal rights in this action.  Joann Brown seeks reasonable attorneys' fees and costs in this matter.

## VIII.     REQUEST FOR RELIEF

WHEREFORE, Plaintiff Joann Brown respectfully requests that Defendant Colonial be cited to appear and answer, and that after a trial by jury, Plaintiff Joann Brown take judgment against Colonial as follows:

     a.  Judgment against Colonial for a sum within the jurisdictional limits of this Court;

     b.  Economic damages including back pay;

     c.  Reinstatement if reinstatement is deemed feasible.  If reinstatement is not deemed feasible, economic damages including front pay;

     d.  Compensatory damages;

     e.  Actual damages including out-of-pocket losses incurred by Plaintiff Joann Brown;

     f.  Pre-judgment interest in the maximum amount allowed by law;

     g.  Post-judgment interest in the maximum amount allowed by law;

     h.  Reasonable and necessary attorneys' fees;

     i.  Costs of suit; and

     j.  Such other and further relief to which Plaintiff may be entitled.

## JURY DEMAND

Plaintiff exercises her right to a trial by jury and tenders the appropriate fee with this Complaint.

Respectfully Submitted,

By: _Joshua Graham_

**Joshua Graham & Associates, PLLC**
100 E. 15th Street, Suite 635
Fort Worth, Texas 76102
Phone: 817-789-4000
Fax: 817-789-4001

Joshua S. Graham
Bar No. 24080736
jsg@joshuagraham.com

Marializa E. Kelly
Bar No. 24097928
mekelly@joshuagraham.com

**ATTORNEYS FOR JOANN BROWN**

## CERTIFICATE OF SERVICE

On February 3, 2017, I submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas. I hereby certify that I have served all counsel of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

Dated: February 3, 2017

Joshua S. Graham
jsg@joshuagraham.com

**ATTORNEY FOR JOANN BROWN**